**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **JOSIA BLOKKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) **Case No. CIV-11-783-L** |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT & RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for disability insurance benefits (DIB) and supplemental security income benefits (SSI) under the Social Security Act. This matter has been referred to the undersigned magistrate judge for initial proceedings consistent with 28 U.S.C. §636(b)(1)(B)-(C). The Commissioner has answered and filed the administrative record (hereinafter TR. ___). The parties have briefed their positions and the matter is now at issue. For the reasons stated herein, it is recommended that the Commissioner's decision be **REVERSED AND REMANDED for further administrative proceedings.**

### PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI alleging a disability beginning May 30, 2004 (TR. 22). The applications were denied on initial consideration and on reconsideration at the administrative level (TR. 22). Pursuant to Plaintiff's request, a video

hearing *de novo* was held before an ALJ on June 5, 2008 (TR. 32-67). At the hearing, Plaintiff appeared with counsel and testified in support of the applications (TR. 39-60). A vocational expert (VE) also testified at the request of the ALJ (TR. 60-66). The ALJ issued his decision on December 2, 2008 finding that Plaintiff was not entitled to DIB or SSI (TR. 22-31). The Appeals Council denied the Plaintiff's request for review on February 18, 2011, and thus, the decision of the ALJ became the final decision of the Commissioner (TR. 11-13).

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotation omitted). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004). The court "meticulously examine[s] the record as a whole, including anything that may undercut or detract from the [administrative law judge's] findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment

for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

## THE ADMINISTRATIVE DECISION

In addressing the Plaintiff's disability applications, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2004 (TR. 24). The ALJ then followed the five-step sequential evaluation process set forth in 20 C.F.R. §404.1520. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity from her onset date, and so the process continued (TR. 24). At step two, the ALJ concluded that Plaintiff had the following severe impairments: Multiple sclerosis, obesity, depressive disorder, and personality disorder (TR. 24). At step three, the ALJ found that the Plaintiff did not have an impairment or combination of impairments which met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (TR. 25). At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work (PRW) (TR. 30).

At the point that step five is reached, a disability affecting work activity has been shown and the burden shifts to the Commissioner to show that the claimant retains the ability to perform an alternative work activity which exists in the national economy. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). The ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform "the full range of sedentary work" and more specifically that

> She can lift 15 to 20 pounds occasionally and less than ten frequently. She requires a sit/stand option to perform work. She can sit six hours [out of an] eight hour day and stand and walk about three hours out of an eight hour day. She

3

has no limitations on hand controls. She can occasionally climb stairs at a slow pace and requires a rail. She cannot climb ladders, scaffolds or ropes. She can occasionally balance, crouch, stoop, kneel and crawl. She must avoid concentrated exposure to hazards such [as] heights, machinery, high heat and humidity. She has mild to moderate pain and discomfort noticeable at all times, but with medication is capable to be active to the level described. She has mild limitation on her activities of daily living and social functioning. She has moderated[*sic*] limitations on concentration, persistence and pace. She has moderate limitations in her ability to carry out detailed instructions and maintain extended periods of concentration, adapt to changes in routine or setting. She has moderate limitations in her ability to work in proximity or coordination with others. Due to a combination of problems she has [she] is moderately limited in her ability to complete a full workday or work week without interruption from psychologically based symptoms.

(TR. 26). The ALJ considered the testimony of the VE, used the Medical-Vocational Guidelines as a framework for decision making, and determined there were jobs existing in significant numbers in the national economy which Plaintiff could perform. Thus, at step five the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act and was therefore not entitled to DIB or SSI (TR. 30).

## ISSUES PRESENTED

Plaintiff challenges the Commissioner's decision claiming that (1) the Commissioner's decision is not supported by substantial evidence; (2) the ALJ erred in failing to properly consider the results of a vocational examination conducted by Dr. Stephen Porter; (3) the ALJ erred in failing to ask the VE whether her testimony conflicted with information in the Dictionary of Occupational Titles; (4) the ALJ erred in failing to examine the mental demands of work; (5) the ALJ erred in failing to conduct a

4

full and fair hearing; (6) the ALJ erred in failing to properly analyze credibility issues, pain issues, and obesity issues; (7) the ALJ erred in formulating Plaintiff's RFC; (8) the ALJ erred in analyzing records from treating physicians; and (9) the ALJ erred in failing to take into account all of Plaintiff's Global Assessment of Functioning (GAF) scores.[1]

## ANALYSIS

### A.  Substantial Evidence

As part of her claim that the ALJ's decision is not supported by substantial evidence, Plaintiff challenges the ALJ's failure to discuss all of the medical records from her treating physicians as well as his failure to adequately explain the reasons for the weight given to treating physician opinions that he did discuss. Social Security regulations require the ALJ to evaluate every medical opinion in the record, giving varying weight to each opinion "according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). In *Goatcher v. United States Dep't of Health & Human Services*, 52 F.3d 288 (10th Cir. 1995), the Tenth Circuit outlined factors which the ALJ must consider in determining the appropriate weight to give a medical opinion.

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4)

---

[1] A global assessment of functioning score is a subjective determination based on a scale of 1 to 100 of the clinician's judgment of the individual's overall level of functioning. *Salazar v. Barnhart*, 468 F.3d 615, 624 n. 4 (10th Cir. 2006) (*citing* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) (DSM-IV) at 32). The higher the GAF score, the better the individual's psychological, social, and occupational functioning is judged to be.

> consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 290; 20 C.F.R. § 404.1527(d)(2)-(6).

A "treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations such as consultative examinations. . . ." *Id.* (quotation omitted). If an ALJ rejects a treating physician's opinion and relies instead on the opinion of another medical source, he must follow specific guidelines. *Id.* First, he must "articulate specific, legitimate reasons" for the rejection. *Id.* (quotation omitted). Second, he must "explain the weight" accorded the opinion of an examining or nonexamining physician and "give good reasons in his written decision for the weight he gave to the treating physician's opinion." *Id.*

Plaintiff was first diagnosed with multiple sclerosis in the spring of 2003. Plaintiff was treated on an emergency basis on April 2, 2003, complaining of headache, vertigo and weakness in her left arm and leg. The emergency room doctor diagnosed left-sided weakness of undetermined etiology (TR. 384). On April 3, 2003, Plaintiff underwent an MRI brain scan which led the attending doctor, Dr. John Pershing, to render a diagnosis of demyelinating brain disease suggestive of multiple sclerosis (TR. 383). Dr. David W. Lautz, the physician who reported the results of Plaintiff's MRI, noted lesions in the left brachium pontis which were "quite characteristic of the demyelinating plaques of multiple sclerosis" (TR. 381).

On April 7, 2003, Dr. Richard D. Hutter examined Plaintiff and ordered a flouroscopic lumbar puncture (TR. 381). Testing revealed that the cerebrospinal fluid had 93 white cells and 2 oligoclonal bands with an elevated IgG. These findings confirmed the diagnosis of multiple sclerosis (TR. 629, 630).  Dr. Rifaat Bashir examined Plaintiff on September 18, 2003. He stated that Plaintiff had "remitting/relapsing multiple sclerosis" and that she had had several attacks since her initial diagnosis (TR. 440).

In March 2004, Plaintiff and her husband moved to the Netherlands. Plaintiff testified that she and her husband went to the Netherlands because she did not have medical insurance and had been refused treatment for her multiple sclerosis in the United States (TR. 51-52). Once there, Plaintiff was required by law to wait for a specified time before she could procure medical care (TR. 52). By August of 2004, Plaintiff was experiencing yet another "serious episode of multiple sclerosis" and was treated by neurologists at the Gemini Hospital (TR. 591-594). A medical record from October 2004, mentions serious changes in the right hemisphere of Plaintiff's brain and continuing paralysis of her left arm even though the paresis in her left leg was improving. At that point, she was still a patient in a rehabilitation unit in the Netherlands (TR. 597).

Plaintiff testified that she and her husband returned to the United States, but the exact date of their return is not documented in the record. On March 7, 2005, Dr. F.B.J. Scholtes, a neurologist in the Netherlands who had treated Plaintiff, wrote to Plaintiff's

treating physician in the United States regarding Plaintiff's exacerbated attack of multiple sclerosis:

> In conclusion this patient is suffering from a severe aggressive type of multiple sclerosis with exacerbations and remissions. At the moment she is being treated with Copaxone. She's severely disabled with still a persistent hemiparesis on the left

(TR. 619).  On December 12, 2005, Dr. Scholtes wrote a letter stating that Plaintiff was suffering from multiple sclerosis with hemiparesis on the left. He closed the letter by stating, "Please take into account her disability" (TR. 621).

On February 17, 2006, Dr. Kurt A. Swanson, D. O., conducted a disability examination.  In his report, Dr. Swanson stated:

> My opinion would be that patient may not do well with any kind of hard physical labor as she is probably more likely to tire and wear out easily and this may actually exacerbate her MS symptomatology. Anything that would require fine detailed muscle control involving the left side may also be suboptimal for this patient given her past history

(TR. 631).

On April 17, 2007, Plaintiff suffered another acute exacerbation of her multiple sclerosis and was admitted to an in-patient rehabilitation unit from which she was released on May 24, 2007 (TR. 746, 749). After she was released from the rehabilitation unit, Stephen H. Porter, Ph.D., completed an Adult Disability/Neuropsychology report dated June 11, 2007 (TR. 713-716). Dr. Porter cited test results which indicated "a distinctly abnormal neuropsychological profile" (TR. 713). The testing also indicated motor deficits, visual field defect, memory and intellectual deficits, and very significant deficits involving frontal and executive functions. *Id.* Dr. Porter completed the O'Net

8

Ability Profiler, a tool developed by the Department of Labor to measure skills and aptitudes in areas considered to be essential functions of the jobs in the work force. Plaintiff's scores were low in the areas of verbal ability, arithmetic reasoning, computation, spacial ability and form perception (TR. 714). She scored in the 1st percentile on fine and gross motor coordination. Dr. Porter found that Plaintiff's low score on the finger dexterity scale demonstrated significant deficits. *Id.* Dr. Porter noted that Plaintiff was in a wheelchair and that she very slowly completed manual tests which could be performed while sitting (TR. 715). Dr. Porter stated that Plaintiff's vocational profile, as determined by the O'Net Occupational Network, compared to jobs listed in the Dictionary of Occupational Titles indicated there were no matches. Dr. Porter listed Plaintiff's functional limitations and stated that Plaintiff could not work an 8-hour day and that there was no indication she would ever be able to return to competitive work. In sum, Dr. Porter stated that Plaintiff "does not meet the minimum criteria to be predicted to be successful in any of these 66 occupational classes which represent about 2500 jobs" (TR. 715)*.*

In a letter to Plaintiff's attorney dated July 6, 2007, Dr. Hutter outlined Plaintiff's history of exacerbating/remitting multiple sclerosis. Dr. Hutter wrote:

> [Plaintiff's] problems with multiple sclerosis have affected her physical condition to the point where she is unable to engage in gainful employment. That was also the case when I saw her in May of 2003.

(TR. 718). Dr. Hutter noted that Plaintiff had moved to Omaha, Nebraska, and then the Netherlands, in 2003 and 2004 respectively, but that she had returned in February 2006. Dr. Hutter was of the opinion, based on her medical records from the Netherlands

and the appearance of her MRI brain scans, that Plaintiff would have been unable to be gainfully employed since becoming disabled in 2003 or early in 2004 (TR. 718).

In his decision, the ALJ did not acknowledge or discuss the extensive medical records from Plaintiff's treating physicians at the Gemini Clinic in the Netherlands (*See* TR. 600-623). He did not acknowledge or discuss the opinions of Dr. Scholtes regarding Plaintiff's functional limitations resulting from her aggressive form of multiple sclerosis which had left her partially paralyzed on the left side of her body (TR. 600-601). The ALJ also ignored the opinion of Dr. Kurt Swanson (TR. 631).

The ALJ gave "[m]inimal weight" to the opinion of Dr. Hutter because he "was not involved in her treatment" after 2003. Dr. Hutter not only diagnosed Plaintiff with multiple sclerosis, but also identified the onset date as indicated by Plaintiff's medical records (TR. 718). The ALJ's decision to afford Dr. Hutter's opinion "minimal weight," standing alone, would not be grounds for reversal. On remand, however, the ALJ should consider all the medical evidence using the factors set forth in the regulations.

Although he ignored or minimized the importance of the medical records and opinions of treating physicians, the ALJ purportedly relied on the findings of state agency sources to support his finding that Plaintiff is not disabled:

> As for the opinion evidence, the undersigned has considered the opinions of the State Agency medical consultants and accords significant weight to the State Agency findings, as they are consistent with the medical evidence when considered as a whole. In addition the State agency medical consultants adequately consider[ed] the claimant's subjective complaints and the combined effect of the claimant's impairments

(Tr. 29). The ALJ discussed the opinion of only one state agency medical consultant. Dr. Carroll D. Roland, Ph.D., who examined Plaintiff in February 2006 (TR. 28). His opinion and evaluation dealt primarily with Plaintiff's depressive disorder (TR. 624-628).

In addition to the opinion of Dr. Roland, however, the record contains the initial disability determinations by state agency doctors (TR. 68-83). Dr. J. Johnston's initial consideration of Plaintiff's October 2004 application for DIB[2] includes an explanation of the determination which states in relevant part:

> The [Plaintiff] was diagnosed with MS in 2003. However, this condition had only mild exacerbations through 6/30/04. She was able to ambulate without any assistance, no severe vision problems or any other neurological abnormalities. The evidence shows her MS became disabling in September 2004. She continues to meet this Listing 11.09.[3]

(TR. 73). Dr. Johnston's opinion regarding the onset date as compared to the date last insured is not conclusive and is, in fact, refuted by Dr. Hutter's report. As discussed above, Dr. Hutter, a treating physician, opined that Plaintiff's multiple sclerosis was disabling in 2003 or early in 2004 (TR. 718). But in any event, the fact that Dr. Johnston states that Plaintiff meets Listing 11.09 is relevant to Plaintiff's later application for SSI.

Plaintiff further contends that the ALJ erred in affording "little weight" to the opinion of Stephen H. Porter, Ph.D., who evaluated Plaintiff on an outpatient basis after one of her stays in a rehabilitation unit. The purpose of Dr. Porter's examination was to

---

[2] Plaintiff's October 2004 application was for DIB only, benefits for which she was insured through June 30, 2004. Plaintiff did not file an application for SSI benefits until January 4, 2006.

[3] Although the ALJ found at step two that Plaintiff's multiple sclerosis is a severe impairment, he did not consider the Listing at 11.09.

determine Plaintiff's disability status. The ALJ acknowledged Dr. Porter's opinion, but gave it "little weight" because of Dr. Porter's "limited treatment history with the claimant and inconsistency with the claimant's own testimony and medical reports" (TR. 29). Dr. Porter was not a treating physician. His role was very like that of a consultative examiner. Dr. Porter's opinion provides important evidence regarding Plaintiff's functional limitations. Dr. Porter both reviewed the extensive medical record and administered objective tests which indicated that Plaintiff's aptitudes do not fit any of the requirements for occupations listed in the Dictionary of Occupational Titles (DOT). Finally, the ALJ does not identify the alleged inconsistencies between Dr. Porter's evaluation and Plaintiff's testimony, hampering this Court's ability to meaningfully review the ALJ's decision.

In sum, the ALJ's decision is not supported by substantial evidence in the record. In fact, a comprehensive review of the medical evidence alone outweighs the scant medical evidence upon which the ALJ relied in finding that Plaintiff is not entitled to social security benefits. On remand, the ALJ should consider all medical records and opinions from all treating sources as well as the objective evidence and opinions from vocational sources which are not treating sources.

**B.**     **The VE's Testimony**

Plaintiff contends that the ALJ erred as a matter of law in failing to ask the VE whether her testimony conflicted with information in the DOT. The social security regulations do require an ALJ to inquire about and resolve any conflicts between a VE's testimony and the description of that job in the DOT. *See Poppa v. Astrue*, 569 F.3d at

1173. Where, as here, there were no such conflicts, the ALJ's failure to inquire about such conflicts is harmless error. *Id.* On remand, however, the ALJ will have the opportunity to inquire as to whether the VE's step five testimony is in conflict with information contained in the DOT.

## C.      **Fairness of the ALJ's Hearing**

Plaintiff contends that she did not receive a full and fair hearing because her parents, who attended the hearing, did not testify. Plaintiff notes that the ALJ acknowledged the presence of her parents and stated that they "may testify."  After Plaintiff's attorney completed his questioning of her, the ALJ stated, "Counsel, in the interest of time I'd like to move on to the expert, if that's all right with you" (TR. 60). The attorney answered, "That would be fine" (TR. 60)*.* Plaintiff contends that she did not receive a full and fair hearing, based on the fact that her parents were not called to testify. Plaintiff states that the ALJ was at fault in that "[a] lawyer does what he is told even if it is wrong" (See Plaintiff's Brief in Chief at page 14).

"The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). Plaintiff was given the opportunity to be heard at the administrative hearing. She was represented by counsel. The transcript of the hearing does not support Plaintiff's contention that her parents were not permitted to testify. Moreover, Plaintiff does not point to anything about which her parents could have testified that was not sufficiently addressed by her own testimony.

13

**D.**     <u>**Other Alleged Errors**</u>

Plaintiff contends that the ALJ erred in the formulation of her RFC. In related issues, Plaintiff contends that the ALJ failed to consider the mental demands of the jobs identified by the VE; failed to properly analyze her credibility; failed to assess the effect of her obesity on her ability to work; and failed to consider all GAF scores included in the record.

On remand, the ALJ will necessarily be required to reformulate Plaintiff's RFC. The ALJ will, therefore, have the opportunity to include a discussion of the mental demands of any jobs identified by a VE. The ALJ will also have the opportunity to re-evaluate Plaintiff's credibility and to address the effects of obesity alone and in combination with her other severe impairments. Finally, the ALJ will have the opportunity to take into account all GAF scores in the record. Because remand is necessary in this case, this Court need not consider the merits of these additional assignments of error.

## RECOMMENDATION

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ and the pleadings and briefs of the parties, the undersigned magistrate judge finds that the decision of the Commissioner is not supported by substantial evidence and should be **REVERSED AND REMANDED for further administrative proceedings**.

**NOTICE OF RIGHT TO OBJECT**

The parties are advised of their right to file specific written objections to this Report and Recommendation. *See* 28 U.S.C. §636 and Fed. R. Civ. P. 72. Any such objections should be filed with the Clerk of the District Court by **August 15, 2012**. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

**STATUS OF REFERRAL**

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED this 26th day of July 2012.


_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE